[Cite as *Snapp v. Castlebrook Builders, Inc.*, 2014-Ohio-163.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

SCOTT A. SNAPP,

      PLAINTIFF-APPELLEE,              CASE NO. 17-12-22

      v.

CASTLEBROOK BUILDERS, INC,
ET AL.,                        O P I N I O N

      DEFENDANTS-APPELLANTS.

Appeal from Shelby County Common Pleas Court
Trial Court No. 10CV000052

**Judgment Affirmed**

Date of Decision: January 21, 2014

APPEARANCES:

    *Jon Paul Rion and Nicole Rutter-Hirth* **for Appellants**

    *Timothy S. Sell* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendants-appellants, Stephen Kappeler ("Kappeler") and Castlebrook Builders, Inc. ("Castlebrook"), appeal the judgment rendered on October 5, 2012, by the Court of Common Pleas in Shelby County, Ohio, after a jury trial. On appeal, Appellants raise three assignments of error. First, they argue that Defendant Kappeler was improperly held to be personally liable for the Co-defendant corporation Castlebrook's actions. Second, Appellants assert that the trial court abused its discretion in awarding treble damages and attorney's fees against them. Third, Appellants challenge the jury verdicts as inconsistent and claim that the damages awards were against manifest weight of the evidence. For the reasons that follow, we affirm the trial court's judgment.

FACTS AND PROCEDURAL HISTORY

{¶2} The facts of this matter involve construction of home improvements and additions to a property located in Shelby County, Ohio, belonging to Plaintiff-appellee Scott Snapp ("Snapp"). The construction services at issue were provided by Castlebrook, an Ohio corporation involved in a construction business in Ohio and owned by Kappeler. In February 2010, Snapp filed his Complaint alleging that, in connection with the construction, Defendants Kappeler and Castlebrook violated the Ohio Consumer Sales Practices Act ("CSPA"), committed fraud, breached their contract, and were unjustly enriched. (*See* R. at 1, Compl; R. at 81,

Am. Compl.)  The Complaint further alleged that Kappeler was individually liable for the acts of the corporation Castlebrook, on an alter ego theory.[1]  Snapp demanded damages against both Defendants, jointly and severally.  The matter proceeded to jury trial.

### *The Trial*

**{¶3}** Because one of Appellants' challenges concerns the trial court's denial of their motion for directed verdict made after Snapp's case-in-chief, we review the testimony offered prior to the motion separately.

### *Plaintiff's Case*

**{¶4}** Kappeler testified that he had started the corporation around 2002, by himself, without an attorney's assistance, but his accountant helped him with corporate records and tax matters.  (Tr. at 365-366.)  He admitted that no shares had been issued for Castlebrook and that he had always been Castlebrook's sole employee.  (Tr. at 380.)  He did not receive a salary from Castlebrook or take draws from his corporation, but instead he used the company money to pay for his credit cards and other expenses, in lieu of salary.  (Tr. at 367-368.)  He used his corporate checking account to pay for his daughter's apartment in Columbus, personal medical treatment, gasoline, and his truck.  (Tr. at 368-370.)

---

[1] The Amended Complaint included additional parties as well as a claim for mechanics liens.  (Am. Compl.)  These other parties and the claim for mechanics liens are not related to this appeal and we will not discuss them herein.  Likewise, we will not address the merits of Appellants' Counterclaim and their Third Party Complaint, as they are not challenged here.

{¶5} When Kappeler was presented with the minutes from 2003-2011 yearly corporate meetings of shareholders and directors of Castlebrook, he admitted that none of the minutes were signed and all looked exactly the same, apart from the date. (Tr. at 360-362.) As of the time of the trial, the corporation was headquartered in Kappeler's home. (Tr. at 366.)

{¶6} According to Snapp's testimony, he first came in contact with Kappeler in January or February 2008, when he was looking for a local contractor to fulfill his dream of restoring his family property. (Tr. at 120-126, 202-203.) Snapp testified that he had found Kappeler's business in a phonebook and because he lived in Los Angeles at the time, this initial contact was over the phone. (*Id*.) After initial phone discussions, Snapp, Kappeler, and a person introduced as Kappeler's "partner" Gary Meyer, met at Kappeler's residence in Ohio to discuss the project. (Tr. at 127.) At that meeting, Snapp was told that he was dealing with Kappeler's business, Castlebrook and not with Kappeler personally. (Tr. at 213.)

{¶7} Snapp testified that Kappeler had asked him for an initial payment of $2,000 to secure permits and architect's services for the project. (Tr. at 128.) Upon payment, Kappeler obtained architectural drawings, which he sent to Snapp together with a rough blueprint. (Tr. at 128-129.) The parties did not meet face-to-face anymore until the beginning of the project in May 2008, but they remained in phone contact, discussing details of the project. (Tr. at 129-130.)

{¶8} Snapp testified that the project involved remodeling an old house and constructing a new addition. (Tr. at 130-133.) He stated that before the work on the project started, he and Kappeler had discussed the details of the construction, including what work needed to be performed on the old house and certain specifications for the addition, as well as details about flooring, tile, marble, and cabinets in the house. (Tr. at 131-132, 260.) Yet, Snapp never provided anything in writing to Kappeler or Castlebrook about the details on the finishings of the interior of the project; there were merely talks about "how things would be done and finished." (Tr. at 218.)

{¶9} According to Snapp, the price of the project was discussed on three different occasions prior to starting the construction. (Tr. at 133.) Upon seeing the first plans and the first drawings, Kappeler estimated the project to cost "anywhere from 360 to 500, but he wasn't sure at that point." (Tr. at 133.) As the discussions progressed, Kappeler said it "might be a little over" $500,000. (Tr. at 133-134.) The parties eventually agreed that the price was going to be "a time and material plus 10 percent for a management fee." (Tr. at 134-135.) Snapp understood the ten percent management fee was to be included in the $500,000 estimate. (Tr. at 135.) Snapp claimed that the estimate given to him by Kappeler was based on the entire project, not just the initial drawings. (Tr. at 207.) These estimates were never put in writing. (Tr. at 135.) Snapp clarified that he was

never refused a written estimate; he just never asked for it. (Tr. at 217, 227.) He was also never offered a written estimate and was never told by Kappeler that he had a right to a written estimate. (Tr. at 258.)

{¶10} Snapp stated that during the discussions with Kappeler he was not advised that certain services, such as rent of equipment owned by Kappeler, Kappeler's wife's clerical work, Kappeler's own clerical work, and his management services, would be billed separately, in addition to the ten percent fee agreed upon. (Tr. at 178-179.) Likewise, the initial discussions did not mention payment for Kappeler's letterhead and business cards, his utilities, or his children's personal credit cards. (Tr. at 179-180.) Snapp was not aware of these billing practices until after the initiation of this suit. (Tr. at 178-179)

{¶11} Snapp never demanded a contract but he did ask Kappeler whether they needed one. (Tr. at 135, 208.) Kappeler responded "Trust me, we'll be fine, I'll take care of you." (Tr. at 208.) Snapp believed, however, that he had an oral contract with Kappeler as of February or March 2008 and the price for the contract was "time and material plus 10 percent." (Tr. at 209.) He admitted that in his answers to interrogatories submitted prior to trial he had claimed that the agreed upon contract price was $450,000. (Tr. at 211.) In spite of this inconsistency, he claimed that the numbers discussed before, such as $500,000 or $450,000, were estimations rather than the contract and that the only contract that existed was for

time and material plus ten percent. (Tr. at 211-212). Kappeler promised him the project would be completed in November at the latest. (Tr. at 134.)

{¶12} Snapp testified that at the time of the oral agreement, the blueprints representing the architectural design of the construction were available to both parties, although some of the things changed later because of necessity. (Tr. at 136-137.) He admitted that there were some details about interior that could influence the price, which were not initially discussed with Kappeler. (Tr. at 219.) He admitted there were jobs not initially contemplated that Castlebrook performed, including demolition work on properties purchased after the initial discussions with Kappeler. (144-145.) Some of the changes to the project were requested by Snapp, while others were recommended by Kappeler. (Tr. at 159.) Snapp claimed that there were some changes he never authorized, such as enlarging the garage. (Tr. at 161.) Many changes were made as the project went on and Snapp realized those changes would require more material and labor. (Tr. at 223-228.) He was prepared to pay a higher price based on the changes to the original design. (Tr. at 263.)

{¶13} According to Snapp, with an exception of the change to the pitch of the roof, Kappeler never quoted a price for the modifications and Snapp never asked how much they would cost, although he was always asking for accountings. (Tr. at. 158-160, 226.) Snapp was not aware of whether he was ever charged for

the unanticipated changes that he did not authorize, because he was not provided with an accounting. (Tr. at 223, 261.) Any changes to the project that were requested by Snapp were completed by November and, after that time, there should have been no more modifications. (Tr. at 263.)

{¶14} The entire project lasted from May 2008 to July 2009 and Snapp visited the site about eight times during that time to observe the progress. (Tr. at 275.) There were other people that Snapp considered involved in the project; for example, Terry Waters, whom he considered to be the managing part of the project. (Tr. at 229.) Snapp denied considering himself to be a managing person for the project, but he admitted to testifying differently at his deposition when he answered in the affirmative to a question whether he "had a role in managing this project." (Tr. at 229-230.) He explained that his role involved selecting tiles or cabinets. (Tr. at 265.)

{¶15} Snapp did not know much any of the subcontractors were paid or how much the materials for the project cost. (Tr. at 164.) He was never provided with invoices for any materials or for the work subcontractors did. (Tr. at 264.) Although Snapp claimed he had never received an accounting from Kappeler, he admitted having received spreadsheets with items broken down by categories, which he did not consider to be a proper accounting. (Tr. at 274-276.) He never

asked for an accounting in writing. (Tr. at 276.) Nevertheless, he submitted payments to Kappeler.

{¶16} As far as Snapp was aware, all the payments made on the project were made out to Castlebrook and not to Kappeler, personally. (Tr. at 214.) The payments were submitted from various sources on behalf of Snapp. (Tr. at 215-216, 258-259.) In early September of 2008, after having paid $372,000, Snapp was asked for another $195,000. (Tr. at 146, 148.) Because it would have taken him over the $500,000 of initial projections, and he saw that the work was not "anywhere close to a finished house," Snapp started questioning the costs. (Tr. at 146, 148.) He became very concerned, started asking how much more it was going to cost, and requested an accounting. (Tr. at 146-147.) No accounting was provided to him, but he was given a number of $350,000, which he understood to be enough to finish the project. (Tr. at 147, 150-151.) He made the payment of $195,000 and, after that point, additional sums of money were requested and submitted. (Tr. at 151-152.)

{¶17} Snapp testified that while he was concerned about the costs, the lack of accounting, and the project not coming to an end, Kappeler kept asking for trust. (Tr. at 152.) He remembered that around November or December 2008 the cost of the project was coming close to $900,000, but by March or April, Kappeler asked for more money. (Tr. at 152-153.) Snapp expressed concerns about the

additional expenses at that point and he was getting frustrated; yet, by May 2009, he paid another $107,000. (*Id.*)

**{¶18}** Snapp testified that in May 2009, he had been notified that the work on the project had stopped due the lack of money. (Tr. at 154.) Snapp decided to seek a legal remedy. (Tr. at 154.) After a teleconference with his attorney and Kappeler, the parties agreed that Snapp would pay another $150,000, conditioned upon being provided with a full accounting and being able to move in by June 17, 2009. (Tr. at 155.) Although he submitted the payment, he was never provided with the accounting. (Tr. at 155, 243.) Snapp was asked about a written letter memorializing the agreement, pursuant to which he was obligated to pay any balance of money owed to Castlebrook "in conjunction with a full accounting being provided to Mr. Snapp regarding labor, materials, and all money spent on the project." (Tr. at 243.) Snapp testified that he did not write or sign that letter, however, and he did not commit to it. (Tr. at 243.) He denied that the letter represented an agreement between him and Kappeler or Castlebrook, but claimed that it was merely a confirmation that $150,000 was sent by him in order to be able to move into his house. (Tr. at 244.)

**{¶19}** According to Snapp, at one point, and due to a mistake, Kappeler was sent an additional $13,800. (Tr. at 156.) Snapp repeatedly asked for the money back but never received it because Kappeler claimed that this money was

owed to him. (*Id.*) The project did not get completed until mid-July of 2009, in spite of the payment of $150,000 agreed upon in May 2009 and the mistaken payment of $13,800, which took the costs to $1.3 million. (Tr. at 162-163.) As of June 2009, based on what he was told, Snapp believed that he still owed $53,000 to Castlebrook. (Tr. at 247-248.) He never made that payment. (Tr. at 248.)

{¶20} Snapp testified that upon moving in, in July 2009, the house was unfinished and some things were defective, including gaping holes in the baseboard, excessive peeling of the plaster, flaking and bubbling of the paint. (Tr. at 164, 167-168.) Neither Kappeler nor his business Castlebrook ever fixed those deficiencies and Snapp became responsible for the cost of the repair. (Tr. at 178.) He did not have a calculated number, however, for how much the alleged defects cost him. (Tr. at 236-240.)

{¶21} Snapp testified that the total amount of money paid for the project was $1,314,218, a number of which he had never been advised prior to hiring Castlebrook. (Tr. at 138, 157.) Upon completion, the new addition itself measured about 6,000 total square feet and Snapp claimed that he would be willing to pay for the value of what he had received, assuming that it, in fact, was the value. (Tr. at 198, 267.)

{¶22} Snapp testified that throughout the entire project he had dealt with Kappeler only. (Tr. at 213.) He did not think that Kappeler had created Castlebrook just for the sole purpose of defrauding him. (Tr. at 214.)

{¶23} Snapp admitted that before hiring Castlebrook, there was another contractor, Wayne Garber, hired to perform work on the old house. (Tr. at 200-201.) Garber was hired just prior to the construction starting, "just to kind of help things out," and remained on the construction for about ten to twelve weeks, before Castlebrook came on. (Tr. at 258.) Snapp did not have a written contract with Garber or an estimate from him. (Tr. at 201.) Garber was paid on the time and material basis, but did not receive an additional ten percent fee. (Tr. at 202.)

{¶24} During his case-in-chief, Snapp offered testimony of Mr. Robert Melvin ("Melvin"), an expert in the cost and draw analysis, as well as construction workmanship. (Tr. at 297-298.) Melvin spent over 200 hours reviewing this case, which included invoices, statements, bank records, as well as additional documents related to this litigation. (Tr. at 298-299.) He also looked at the blueprints of the project and approximately 600 photographs showing the progress of the job from start to finish. (Tr. at 300-301.) Melvin testified that the project is less than 2,000 square feet. (Tr. at 301.)

{¶25} Melvin testified to what Kappeler's role as a project manager should have been and criticized his performance of this function. (Tr. at 304.) For

example, the initial documents did not include anything establishing the quality of the materials, allowances for specialties like the kitchen, the tile work, the countertops, all of which he usually expected to see in projects; there was nothing besides the blueprints. (Tr. at 302.) He stated that providing this kind of estimates and allowances is the contractor's responsibility. (Tr. at 303.)

{¶26} Melvin commented that there was a lot of chaos on this project. (Tr. at 303.) Several contracts with subcontractors were missing and he had to establish some values based on the drawings. (Tr. at 304-305.) He noticed that there were "extensive areas where there was an over amount of hours charged," and substantial discrepancies in records that he reviewed. (Tr. at 306, 308.) Melvin pointed out that the value given to him for the foundation work was nearly double of what his estimates were. (Tr. at 305.) He found four separate invoices from three separate contractors for the foundation work, one indicating that excavation for the foundation was performed "a week after the actual foundations were dug," and another one indicating that a contractor did the foundation excavation work twice. (Tr. at 308-309.) He also noticed that the same charge of $36,000 for the foundation was billed twice. (Tr. at 313.)

{¶27} Melvin noticed double charges for the lumber materials and calculated that out of $130,000 charged in lumber materials there was only legitimately about $30,000 worth of materials in this project. (Tr. at 311-312.) He

also noticed that some of the materials on the invoices from the lumber company were not for this project. (Tr. at 311.) He estimated that out of the $85,000 worth of materials there was only $25,000 that was actually related to the framing. (Tr. at 311.) He noticed charges for cabinets totaling almost $30,000, which was suspicious because this project had $50,000 worth of custom cabinets in it and did not have any store cabinets. (Tr. at 312.) He noticed that Snapp was charged for enough material to build approximately a mile of road, but no such road was built on his property. (Tr. at 315.) The invoices also included at least four kitchen stoves, three refrigerators, and five dishwashing machines; the house did not have this amount of appliances in it. (Tr. at 318-319.)

{¶28} According to Melvin, Snapp was charged for a down payment on the purchase of a Bobcat and for the purchase of an auger, neither of which were given to Snapp; Snapp was then charged for the rental of the Bobcat in addition to being charged toward the purchase of it. (Tr. at 317, 320.) Melvin also pointed out charges for tools for which the consumers should not be responsible, in the amount of almost $2,000. (Tr. at 311.) Some other equipment rental was charged to Snapp, even though it was not used at the construction site during the time. (Tr. at 317-318.) Throughout the billing, Melvin found at least one invoice that had the name of a different project on it and other invoices that obviously did not belong to this project. (Tr. at 315-316.)

{¶29} Melvin ascertained that, in addition to charging Snapp for the ten percent management fee on top of time and material, Castlebrook charged for about forty hours a week of work provided by Kappeler, which was unsupported by any evidence of any work performed by him apart from the management of the project. (Tr. at 320-321.) Melvin commented that the documentation did not support any such labor provided on the project by Castlebrook since everything was subcontracted. (Tr. at 342.) The invoices also indicated charges for work provided by Kappeler's business associate, Gary Meyer, in the amount of forty hours each week during the duration of project; while other documentation showed that Meyer was working on different projects during some of that time and that he did not start the actual work on Snapp's residence until May or June. (Tr. at 321-322.)

{¶30} Melvin calculated the actual value of the project and came up with a number between $540,000 and $580,000. (Tr. at 322-323.) He further criticized the workmanship of the project and estimated that approximately $11,000-$12,000 would have to be spent to remedy various issues. (Tr. at 324-332.)

{¶31} Kappeler was called to testify in Snapp's case-in-chief. He claimed that, initially, his company was not supposed to work on the old house and was only hired to construct the addition. (Tr. at 424.) He denied estimating the project at $500,000, stating that he "may have said" the number of $520,000 based on the

"chicken scratch piece of paper that he had." (Tr. at 395-396.) Kappeler claimed that, even after the blueprints were prepared, it was impossible to determine what the cost of the project would be because none of the details were decided. (Tr. at 396.) He testified that Snapp told him "as long as you treat me right, just keep her goin.'" (Tr. at 396.) Kappeler admitted that, although he normally uses a contract for his construction work, this project was different and a contract for it would not be convenient due to the nature of the project. (Tr. at 627-628.) At the same time, he agreed to charge Snapp a lower fee of ten percent for profit on top of the costs, although his regular fee would be fifteen percent, which made Snapp "elated." (Tr. at 469.)

{¶32} Kappeler testified that, in addition to receiving ten percent of the cost of the project, he also charged Snapp for his own labor, which included, for example, getting measurements for the architect. (Tr. at 445-446.) He did not, however, inform Snapp that he incurred over $79,000 for his own labor, charging forty dollars an hour. (Tr. at 446.) Kappeler did not have any documentation to prove that he had spent 1,983 hours working on the project between March and December 2008, as he claimed. (Tr. at 447-448.) In 2009, his work resulted in a charge of $53,120. (Tr. at 448.) He also paid his wife over $8,000 for her help with clerical work. (Tr. at 448, 567.) He admitted charging Snapp for rental of construction equipment that his company owned. (Tr. at 464-465, 473.) The ten

percent fee was calculated off of the costs of the project, which included Kappeler's own labor and rental equipment from Castlebrook. (Tr. at 476.) Furthermore, although Kappeler had received discounts on some products or services, he charged Snapp full price for those products or services. (Tr. at 532-533, 538.)

{¶33} Kappeler testified that Gary Meyer was a subcontractor with whom he had been working for the past eight years, "day-to-day." (Tr. at 499.) Meyer had submitted some invoices for this project, which were paid by Castlebrook and then charged to Snapp at the rate of forty dollars an hour, or sixty dollars an hour for work on a Bobcat. (Tr. at 499-505.) Kappeler explained that he did not require Meyer to provide any documentation as to the time actually spent working on the project because he trusted him absolutely. (Tr. at 500.)

{¶34} Kappeler testified that, throughout the transaction, in order to receive a payment from Snapp he would call Snapp and ask for money, without specifying what it was for, and Snapp would submit the payment. (Tr. at 633-635.) No writings were exchanged; payments were made based on oral conversations. (Tr. at 633-634.) These conversations were not documented. (Tr. at 634.)

{¶35} Kappeler denied being asked for an accounting by Snapp but he stated that Castlebrook kept providing Snapp with accountings, which were broken down by the type of job and the amount incurred by Castlebrook on those

jobs. (Tr. at 381.) The accounting statements were printed off from the program used by Kappeler called QuickBooks Pro, but they did not include dates, names of contractors, or amounts paid to each of them. (Tr. at 381-383.) Kappeler testified that Snapp never asked him for invoices related to Castlebrook's labor on the project. (Tr. at 446.) The first time a detailed accounting was requested was in May 2009. (Tr. at 384.)

{¶36} Kappeler testified about a list representing checks and expenses related to this project, stating that it was given to Plaintiff for the purposes of this trial. (Tr. at 372-378.) He explained that some of the checks given to Plaintiff were not actually related to the project but ended up in discovery "because this is a block of checks." (Tr. at 374-378.) He confirmed that over $59,000 represented by these checks should not have been charged to Snapp because those payments did not relate to the project. (Tr. at 379.)

{¶37} There were invoices and charges that Kappeler could not explain. (Tr. at 474-475, 551, 581-582.) Among other things, he could not explain why a charge from 2006 for excavation work on the foundation was billed to Snapp even though his project did not start until 2008. (Tr. at 493.) Kappeler could not explain charges on his credit card that were assigned and billed to Snapp. (Tr. at 416-426.) He had no receipts showing that those charges were actually related to the project. (*Id.*) He lacked proof and was unable to explain many other charges

and payments on the project. (*See* Tr. at 425-426, 463, 479-480, 482, 497, 514.) He admitted to some inconsistencies between his exhibit that represented charges to Snapp and what was actually paid (for example a check for $1,000 was represented on his statement as a check for $9,000). (Tr. at 426-427.) Some charges represented payments that were for other projects and some invoices were mistakenly charged to Snapp. (Tr. at 428-430, 494-495, 515, 602, 603, 608-610.) Kappeler confirmed that the $3,000 charge for auger, the charge for the Bobcat, or the multiple-times billed $7,305 charge for fencing that was for Kappeler's personal use, should not have been included in the billing to Snapp. (Tr. at 439, 486-487, 517-518.) Kappeler admitted that out of the total amount of $281,535.56 that he had charged to Snapp for invoices from Piqua Lumber, only $83,718.13 were actually legitimate charges. (Tr. at 545-547.)

{¶38} Kappeler admitted billing Snapp twice for Gary Meyer's services at $26,541. (Tr. at 510.) He admitted to double charging separate amounts of $7,372.30, $4,016.72, $14,448.37, $24,487.73, $2,538.24, $7,396.79, $1,606.36, $36,834, and multiple other individual amounts. (Tr. at 534, 535, 539, 543, 589-590, 594, 596, 625-627.) There was a sum of $14,518.45 that was triple accounted for on Kappeler's spreadsheet. (Tr. at 543.) Kappeler admitted that those charges should not have been billed to Snapp. (Tr. at 438.)

**{¶39}** Kappeler testified that after May 2009, Snapp requested a few additional items added to the project, which resulted in more charges that were not previously contemplated. (Tr. at 411.) He calculated that, after the completion of the job in August 2009, Snapp owed him $64,000. (Tr. at 413.) At the time of the trial, Kappeler was asking for more, however, as a result of going through "every single invoice." (Tr. at 413.)

**{¶40}** At the end of the project, Kappeler's calculations indicated that its entire cost was $1,557,000. (Tr. at 403-404.) He admitted that this calculation included some mistakes and the number was later corrected to $1,349,000. (Tr. at 404.) When asked for confirmation of the final accounting, Kappeler testified that the actual number would be around $1,475,000. (Tr. at 405-406.) As explained throughout his testimony, however, this number included the mistaken charges and multiple billing for the same invoices. (Tr. at 488.) When confronted by Plaintiff's attorney, Kappeler admitted that these numbers were inaccurate. (Tr. at 535.) Towards the end of his testimony, Kappeler acknowledged that the amount of money he claimed he had spent on the job was incorrect and he realized it while on the stand being questioned by Plaintiff's attorney. (Tr. at 540-541, 635.)

**{¶41}** Throughout his testimony, Kappeler denied fabricating any of the numbers intentionally, claiming that the examples of double billing or charging for services and material not related to the Snapp project resulted from  mistakes or

oversight. (Tr. at 540-541, 630-635.) Kappeler admitted that he probably had created some of the invoices at the end of the job although they reflected actual charges from dates before. (Tr. at 459-460.)

*Directed Verdict*

{¶42} At the end of Plaintiff's case, Appellants moved for a directed verdict with respect to fraud, unjust enrichment, and piercing the corporate veil. (Tr. at 639-650.) Regarding the issue of piercing the corporate veil, defense counsel argued that the standard set forth by the Ohio Supreme Court in *Belvedere*[2] was not satisfied with respect to the second prong. (Tr. at 648-650.) In particular, he argued that there was no evidence that Kappeler's control over Castlebrook was exercised "in any kind of a manner to commit fraud or any kind of an illegal act." (Tr. at 648-651.) In his opinion, there had been no evidence offered up to that point that the legal entity of Castlebrook was used that way or that it was formed "for the express purpose of perpetuating a fraud." (Tr. at 649-650.) Defense counsel also suggested that the trial court use the *LeRoux* standard for piercing, which required the corporation to be formed for the purpose of perpetuating a fraud.[3] (Tr. at 648-651.) The trial court rejected that standard as

---

[2] *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993).

[3] *LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 602 N.E.2d 685 (6th Dist.1991), quoting *North v. Higbee Co.*, 131 Ohio St. 507, 3 N.E.2d 391 (1936), at syllabus. We note that Appellants' reliance on that case was misplaced as the *LeRoux* court merely quoted the standard announced previously in *North v. Higbee* and refused to follow it. *See LeRoux*, 77 Ohio App.3d at 421, 423. Furthermore, the Ohio Supreme Court expressly overruled that standard as "too strict." *Belvedere*, 67 Ohio St.3d at 287-288 (1993).

inconsistent with *Belvedere*, which was decided by the Ohio Supreme Court after *LeRoux*. (Tr. at 657.) The trial court found that, looking at the evidence in the light most favorable to the nonmoving party, Plaintiff, there was sufficient evidence presented from which the jury could find that Kappeler exercised control over Castlebrook to commit fraud. (Tr. at 657-658.) Accordingly, the trial court denied Appellants' motion for a directed verdict and the trial continued with Appellants presenting their case-in-chief.

*Defendants' Case*

**{¶43}** Michael Lochard, who was a subcontractor involved in installation of heating and cooling, testified that he had been involved in the project from its early stages until the end. (Tr. at 665-668, 671.) Lochard testified that he saw Kappeler involved in work on the project almost every time he was there, doing a variety of jobs. (*Id.*) He also observed Snapp being involved in the project, requesting changes that required additional labor or material. (Tr. at 665-668.) Lochard did not submit an invoice for his work on the project until June 2009. (Tr. at 668-670.)

**{¶44}** James Meyer, who was another subcontractor involved in the project over several months (mid-June until the end of September, 2008), testified that he saw Kappeler work on the construction daily doing "a lot of different things," that included scheduling, changes, and getting materials. (Tr. at 678-680.) He also

observed Gary Meyer on the project daily. (Tr. at 680.) He saw Snapp when he visited the project. (Tr. at 681.) James Meyer testified that there were numerous changes made to the project, which included moving door openings three times, changing soffits in the bedrooms, changes to window layouts, changes to the breezeway, changes to the old house, and other "little things bein' moved around." (Tr. at 682.) The changes took additional time and required a lot of extra material. (Tr. at 682.) James Meyer worked on the project on the time and material basis, which was his common practice. (Tr. at 683.)

{¶45} Brad Brubaker, who was in the business of making custom cabinetry, performed a project for Snapp's house. (Tr. at 700-706.) He admitted that there were changes to the project, including adding cabinets and "all these fancy things put in different locations," all of which involved extra labor and additional material. (Tr. at 706-707.) These changes were communicated to Brubaker mostly by Terry Waters, who was a designer hired by Snapp. (Tr. at 706.)

{¶46} Wayne Garber, who was in the business of remodeling and construction, testified that he had been hired directly by Snapp for this project. (Tr. at 713-715.) He worked from May until September 2008. (Tr. at 715.) He was not connected to or involved with Castlebrook. (Tr. at 715-716.) His job encompassed the work on the old house and preserving its original condition, but he had no involvement with the new addition. (Tr. at 716-715.) He was the only

person working on the old part of the house until he was "pushed off the job" in September 2008. (Tr. at 718-719.)

{¶47} Ken Luebke, a local contractor who had been in business for thirty-two years, testified as a defense expert witness. (Tr. at 720-731.) His testimony was based on his experience and he had not reviewed any evidence related to this project. (Tr. at 760-761.) He worked on the new addition on the Snapp project, but he never personally interacted with Snapp. (Tr. at 731.) He testified that a time and material contract plus a ten percent profit fee is not out of line in the general contracting field and that for this particular type of project, it was not out of ordinary to use the time and material type of contract. (Tr. at 735-736.) He testified that subcontractors may work on the time and material basis as well. (Tr. at 746.) Luebke himself typically worked on a contract when constructing a house. (Tr. at 762.) He testified that he probably would not have taken a project of this magnitude without a contract because, in his opinion, it would put somebody at risk. (Tr. at 765.) In his business dealings, Luebke did not charge the customer extra for time spent paying the bills or for other clerical work. (Tr. at 767, 783.)

{¶48} Luebke testified that changes to a project usually increase the price of the entire project. (Tr. at 738.) He also stated that forty dollars an hour charge for a general contractor is not out of line. (Tr. at 739-740.) He estimated Snapp's

home to be about 6,000 square feet. (Tr. at 741.) According to him, an average construction cost of a home in Shelby County is between $120 and $150 per square foot, and it would be impossible to build a 6,000-square-foot addition at $500,000, as that would result in a price of $62.50 per square foot. (Tr. at 742-743.)

{¶49} When questioned by the defense counsel, Snapp was asked about the discrepancies between the number he claimed to have paid for the project, which was $1,318,000 and the number that was actually supported by his documentation, $1,011,333. (Tr. at 801.) He could not explain the discrepancy. (*Id*.) He testified that the higher number was supported by the documentation prepared by Kappeler. (Tr. at 802-803.)

{¶50} Kappeler testified in his defense stating that he had been in the construction business for thirty-five years and that his business had never been sued before and never had any complaints. (Tr. at 806, 999.) Kappeler explained the method in which he had prepared Castlebrook's corporate minutes, claiming that the reason they all looked the same was because his attorney just "printed off the paper" every year because nothing was changing. (Tr. at 811.) Kappeler admitted that he had mixed personal purchases with business spending on his business credit cards. (Tr. at 838-839.)

{¶51} Kappeler claimed that he never advertised in the Yellow Pages. (Tr. at 808.) To his knowledge, Snapp first approached Gary Meyer, who later told Kappeler about a possible job from Snapp. (Tr. at 817-818.) Kappeler and Snapp first met face-to-face at the beginning of 2008, when Snapp visited from California. (Tr. at 818.) At that initial meeting, Kappeler did not see the original house and was only approached with a sketch that had very little detail on it. (Tr. at 818-819.) At the time, they did not know what kind of materials were going to be used for the project. (Tr. at 829-830.) Kappeler testified that he was not asked for an estimate, but they did discuss some round figures. (Tr. at 821-823.) According to Kappeler, "The only time we ever gave him an estimate was, I testified, is when he first brought that little sheet in. But then after he had the prints made, you know, the house was twice as big." (Tr. at 1169.)

{¶52} Kappeler testified that, during the initial discussions, the parties agreed on a contract that included time plus material, and ten percent profit, even though he usually charged fifteen percent for profit. (Tr. at 828.) He admitted that this was the first time he had worked on a time and material contract but he thought it would be the best way to handle this project because of the unknown specifications. (Tr. at 832.) Kappeler was told that Snapp had just filed bankruptcy and therefore he would pay for the project "as he goes" instead of

financing it. (Tr. at 823-824.) Kappeler thus informed Snapp that money would have to be paid in advance. (Tr. at 824.)

**{¶53}** Kappeler asserted that his business had not been hired to work on the old part of the house initially and that Wayne Garber was the person involved in work on the old house. (Tr. at 826.) Therefore, they closed off the old section with plywood prior to starting work on the addition. (Tr. at 826-827.) Kappeler did not get involved in the work on the old house until about early September or October 2008. (Tr. at 849, 911.) He claimed that the original drawings and discussions did not include the old house. (Tr. at 849-850.) After Castlebrook started work on the old house, however, the same agreement as to price applied, time and material plus ten percent. (Tr. at 912.)

**{¶54}** Kappeler recalled that when the initial excavation work on the project started, they discovered some water problems. (Tr. at 825.) There were three springs running underneath the house of which Kappeler had not been aware prior to commencing the construction, and which required additional work. (Tr. at 874-875.) Snapp was present at the project when the discovery was made. (Tr. at 825.) Kappeler discussed other changes made to the project and denied making any of them without Snapp's authorization, arguing that Snapp "was a busy fellow and probably just forgot" that he had requested a change. (Tr. at 887-890, 900-902.) Each change increased the cost of the project, and there were many of them.

(Tr. at 902-903; *see, e.g.*, 912-913, 919, 925-926, 931, 945, 949-950, 952.) Some of the changes required tearing down parts of the construction. (Tr. at 986.) Although Kappeler would ask Snapp whether he was sure he wanted to implement the changes, he did not inform Snapp that it would cost more because "we were time and material so it didn't matter, we just did it." (Tr. at 987.)

{¶55} In his testimony, Kappeler described the details of the project. Testifying about the photographs of various rooms in the house, he explained the amount of work, listing persons or subcontractors performing the work and materials that were used. (Tr. at 866-987.) During the project, there were two occurrences when the payments from Snapp stopped and Kappeler's company left the construction site for short times. (Tr. at 855-857.) Even then, they kept working at the shop preparing trim and other things for the job. (Tr. at 857.)

{¶56} Kappeler testified about a meeting with Snapp's attorney, Heath Hegemann, which occurred towards the end of the project, sometime around May 2009. The meeting resulted from work stoppage, which was due to running out of money. (Tr. at 988-989.) Kappeler, Gary Meyer, and Snapp's attorney, Hegemann, were physically present at the meeting and Snapp participated over the phone. (Tr. at 989-992.) The parties agreed upon a deadline to finish the project and for a payment of $150,000 from Snapp. (Tr. at 989-992.) They further agreed that "the balance of any monies owed would be paid in conjunction with a full

accounting being provided to Mr. Snapp regarding labor, materials, and all money spent on this project." (Tr. at 995.) Kappeler failed to send the accounting to Snapp; yet, after the meeting, he believed he was still owed approximately around $60,000 or $62,000. (Tr. at 995, 997.)

{¶57} Kappeler also testified about finances and explained some of the disputed charges. He claimed that he had kept track of the payments made by Snapp through his QuickBooks Pro program. (Tr. at 834-835.) He added that he did not work well with the computers and was not good at keeping track of everything at QuickBooks Pro. (Tr. at 860-864.) He acknowledged the existence of improperly filed invoices. (Tr. at 1058.) There were bills that he could not explain, even though he presumed they were related to the Snapp project because of the timeframe and his certainty that the company was not involved in any other project at the time. (Tr. at 1060-1072, 1082-1093.) He referred to situations when Terry Waters and Snapp would purchase materials for the house and have invoices sent to Kappeler without his authorization. (Tr. at 856.) He claimed that throughout the project, he was never asked for any receipts. (Tr. at 835-836.)

{¶58} Kappeler explained that some of the invoices for the project came at a later date, after the job was completed. (*See, e.g.*, Tr. at 1026-1029.) For example, about a month and a half after Snapp moved in, Castlebrook was requested to do "a couple little things." (Tr. at 992-993.) Additionally, after the

project was over, Kappeler spent about ten hours a week working on paying the bills and going over invoices, charging Snapp for this clerical work at forty dollars an hour. (Tr. at 1029-1030.) He testified that he had not been paid on some of the invoices issued after the project had been completed. (Tr. at 1035.)

{¶59} The addition Castlebrook built for Snapp consisted of 6,000 square feet and the whole project totaled 8,000 square feet. (Tr. at 813.) Kappeler testified that it would be impossible to build an 8,000-square-foot project at the price of $62.50 per square foot. (Tr. at 847.) For that reason it would be impossible to have a contract for the construction of this project at $500,000, as claimed by Snapp. (Tr. at 848.) He disagreed with price estimations by Plaintiff's expert, Melvin. (Tr. at 848.) He also disagreed with Melvin's measurements of the house at 2,000 square feet. (Tr. at 848.)

{¶60} Discussing the final accounting for the construction, Kappeler explained that the number at one of the exhibits, $1,000,602, was incorrect. (Tr. at 863-864.) He did admit that some documents were prepared improperly, including the document indicating double billings. (1098-1099.) He denied, however, ever sending a double or triple bill to Snapp. (Tr. at 1098-1099.) He explained that the incorrect numbers on documents he provided to Snapp during the discovery in this case resulted from human errors rather than his intent to defraud Snapp. (Tr. at 864.) Kappeler explained that the allegations of the double

and triple billing came from a financial statement, which he called a "ledger sheet," used by Snapp's counsel in evidence, which was not prepared by Kappeler personally; although he reviewed it, he did not catch the mistakes. (Tr. at 1099-1100.) Kappeler admitted that this document was "fatally flawed." (Tr. at 1107.)

{¶61} Nevertheless, although the "ledger sheet" had mistakes, his most recent calculations still indicated a figure of $1,330,000 as an amount that labor and materials added up to. (Tr. at 1100-1106.) He testified that when he came up with the number of $1,314,218, he was "just tryin' to be the best [he] could on it." (Tr. at 865.) Towards the end of his testimony, Kappeler testified that after going through the statements a few times, his calculations indicated that this project cost "somewhere around 1.3 to 1.4 million." (Tr. at 1097-1098.)

{¶62} Kappeler testified about a new "worksheet" that he had prepared during the trial together with his wife and his counsel, which outlined the time and materials for the job. (Tr. at 1108-1114.) When preparing this new worksheet, Kappeler removed the inaccuracies that were contained in the original disputed "ledger sheet," on which Snapp's counsel relied. (Tr. at 1117.) He did not add up the numbers on the new worksheet and did not contradict a number calculated by Plaintiff's counsel, totaling $1,190,623.41. (Tr. at 1114-1115.) He insisted, however, that the time and material he expended on this case were between $1.34 million and $1.33 million. (Tr. at 1117.) This number was based on what

Kappeler believed his counsel had added up properly. (Tr. at 1117-1118.) He could not explain an amount of $32,920 that showed up twice on the new worksheet and that referred to two identical invoices. (Tr. at 1119-1122, 1127-1128.) He admitted that he could not prove everything that was spent on this job. (Tr. at 1149.)

*Conclusion of the Trial*

**{¶63}** The jury found that Castlebrook violated the CSPA and that the violation was committed knowingly, awarding Snapp $10,000 in damages on that claim. (Tr. at 1266.) The jury further found that Castlebrook was liable to Snapp for unjust enrichment and fraud, but was not liable for the breach of contract. (Tr. at 1267.) As to the claim of piercing the corporate veil on an alter ego theory, the jury found that

> 1) The individual Defendant Steven [sic] Kappeler's control over Castlebrook Builders, Inc. was so complete that the corporation had no mind, will, or existence of its own, and
>
> 2) * * * Defendant Steven [sic] Kappeler's control of the corporation was exercised in a manner as to commit fraud or illegal act against the Plaintiff, and
>
> 3) Injury occurred due to such control and wrongdoing.

(Tr. at 1265.)

**{¶64}** The general verdict form indicated that the jury found "for Plaintiff Scott A. Snapp and against Defendants Castlebrook Builders, Inc[.] and Stephen

Kappeler for $332,000." (R. at 253, General Verdict, July 12, 2012; Tr. at 1268.) The trial court issued its Judgment Entry on August 10, 2012, ordering that "the Plaintiff recover of Defendant Castlebrook Builders, Incorporated and Defendant Stephen Kappeler, joint [sic] and severally, the sum of Three Hundred and Thirty-Two Thousand and 0/100 Dollars ($332,000.00) * * *." (R. at 261.)

### Post-Trial Proceedings Concerning Treble Damages and Attorney's Fees

{¶65} Following the trial, Snapp filed a "Motion for Hearing on Attorney Fees Costs & Treble Damages" pursuant to an Ohio Revised Code section allowing such damages for any violation of the CSPA, R.C. 1345.09(B). (R. at 259, 274.) Therefore, the trial court's judgment entry also included a clause scheduling the matter "for a hearing on attorney fees, costs, and treble damages" for a later date. (R. at 261.)

{¶66} On October 5, 2012, following a hearing on the issue, the trial court issued its decision, finding "that the specific acts of the defendants are prohibited by the administrative regulations of the Ohio Attorney General," as required by R.C. 1345.09(B). (R. at 279, at 2.) As a result, it awarded "judgment to plaintiff and against defendants, jointly and severally," for an additional amount of $20,000 "to triple the damages found by the jury for violation of the Consumer Sales Practices Act," and an amount of $63,750.55 for Snapp's attorney's fees. (R. at 279, at 3.)

{¶67} Defendants, Kappeler and Castlebrook, filed a timely appeal from this judgment alleging the following three assignments of error.

**First assignment of error**

**Appellant Stephen Kappeler was improperly held to be personally liable for the corporation's liability.**

**Second assignment of error**

**The trial court abused its discretion in awarding treble damages and attorney fees pursuant to R.C. 1345.09.**

**Third assignment of error**

**The jury verdicts were inconsistent and against the manifest weight of the evidence.**

ANALYSIS

{¶68} Before considering the merits of Appellants' assignments of error, we address Snapp's argument that this appeal was improperly filed with respect to assignments of error one and three. Snapp asserts that because the "Notice of Appeal addresses only the October 5, 2012 Decision/Judgment Entry of the trial court," which dealt with treble damages and attorney's fees, this court should confine its review to those issues only. (App't Br. at 12.) He urges us to "summarily deny" the assignments of error challenging the August 10, 2012 Judgment Entry, which was not attached to the Notice of Appeal. (*Id.* at 13.)

**{¶69}** We refuse to so limit Appellants' appeal. *See Beatley v. Knisley*, 183 Ohio App.3d 356, 2009-Ohio-2229, 917 N.E.2d 280, ¶ 8 (10th Dist.) (rejecting an identical argument).

> Pursuant to App.R. 3(D), a notice of appeal "shall designate the judgment, order or part thereof appealed from." However, this rule does not require an appellant to separately identify each interlocutory order issued prior to a final judgment. Interlocutory orders merge into the final judgment, and thus an appeal from a final judgment allows an appellant to challenge both the final judgment and any interlocutory orders merged with it.

(Citations omitted.) *Id.* at ¶ 9; *see also Mtge. Electronic Registrations Sys. v. Mullins*, 161 Ohio App.3d 12, 2005-Ohio-2303, 829 N.E.2d 326, ¶ 21 (4th Dist.); *Horner v. Toledo Hosp.*, 94 Ohio App.3d 282, 289, 640 N.E.2d 857 (6th Dist.1993).

**{¶70}** The Judgment Entry issued by the trial court on August 10, 2012, was an interlocutory order, in which the judge expressly preserved the issue of attorney's fees, costs, and treble damages for a hearing and determination at a later time. That judgment entry, and all issues addressed within it, merged with the final judgment issued on October 5, 2012. Accordingly, Appellants did not need to separately designate and attach the August 10, 2012 Judgment Entry in their Notice of Appeal and therefore, all assignments of error are properly before this Court.

### 1. Personal Liability of Defendant Kappeler for the Corporation's Acts

**{¶71}** Appellants contend that personal liability was improperly attached to Stephen Kappeler under the theory of piercing the corporate veil for two reasons. First, they argue that the trial court should have granted their motion for directed verdict on this issue because there was no evidence to satisfy the elements of the claim. Here, they argue both that the trial court applied an improper legal standard and that, even if the standard was proper, the evidence did not support it. Second, Appellants allege that the jury's verdict piercing the corporate veil was against the manifest weight of the evidence.

#### a. Standard for Piercing the Corporate Veil

**{¶72}** Appellants argue that the trial court improperly found that, in order to pierce the corporate veil, "the corporation must simply be used in committing a fraud" and not that "the corporation must be formed to perpetuate a fraud." (App't Br. at 10, 11.) Appellants argue that the policy of limiting shareholder liability to "instances of extreme shareholder misconduct" mandates the latter to be "the proper interpretation of the law." (*Id.* at 10, 12, quoting *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, ¶ 29.)

**{¶73}** Generally, "shareholders are not subject to personal liability for claims against the corporation." *O'Neill v. United States*, 281 F.Supp. 359, 361 (N.D.Ohio 1968), *aff'd*, 410 F.2d 888 (6th Cir.1969). This principle of

shareholder, officer, or director's limited liability for the debts of the corporation "is ingrained in Ohio law." *Dombroski*, 2008-Ohio-4827, at ¶ 16, citing Section 3, Article XIII, Ohio Constitution and *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993). This rule applies to small corporations because of the legal fiction that "[a] corporation is a separate legal entity from its shareholders, even where there is but one shareholder." *Stuffleben v. Cowden*, 8th Dist. No. 82537, 2003-Ohio-6334, ¶ 25, quoting *LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 420, 602 N.E.2d 685 (6th Dist.1991); *see also Belvedere*, 67 Ohio St.3d at 287. Therefore, in general, only the corporation can be liable for corporate misdeeds. *LeRoux*, 77 Ohio App.3d at 420. Under this general standard, Kappeler, as a sole shareholder of Castlebrook, would be immune from the claims made by Snapp against the corporation.

**{¶74}** "However, shareholders are not absolutely immune from liability for the actions of their corporations." *Dombroski*, 2008-Ohio-4827, at ¶ 17. The fiction of the corporate entity separate from its shareholders "may be disregarded" when it is abused. *Belvedere*, 67 Ohio St.3d at 287; *First Nat. Bank of Chicago v. F.C. Trebein Co.*, 59 Ohio St. 316, 52 N.E. 834 (1898). "The 'veil' of the corporation can be 'pierced' and individual shareholders held liable for corporate misdeeds" in exceptional circumstances when the shareholders use the corporation

"'for criminal or fraudulent purposes' to the detriment of a third party." *Dombroski*, 2008-Ohio-4827, at ¶ 17; *Belvedere*, 67 Ohio St.3d at 287, 289. In those exceptional circumstances, the courts treat the corporation as a mere "'alter ego' of the shareholder thereby rendering the shareholder liable for the obligations of the corporation." *LeRoux*, 77 Ohio App.3d at 420-421; *see also Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, 2009-Ohio-1247, 905 N.E.2d 613, ¶ 11 ("When a shareholder exercises such control over a corporation that the corporation becomes the shareholder's alter ego, and when the shareholder misuses his control of a corporation to commit specific, egregious acts that injure a third party, then it is unjust to allow the shareholder to use the corporate form as a shield to escape the consequences of those wrongful acts."), citing *Belvedere*, 67 Ohio St.3d at 289. According to this standard, Kappeler may be held liable for Castlebrook's wrongful acts notwithstanding the immunity normally afforded corporate shareholders. *See Minno*, 2009-Ohio-1247, at ¶ 25.

{¶75} The courts warn, however, that piercing the corporate veil is a "rare exception." *Dombroski*, 2008-Ohio-4827, at ¶¶ 17, 26. In order to preserve the limited liability and restrict piercing to only the exceptional cases, the Ohio Supreme Court established a three-pronged test that ensures that the proper balance is maintained "between the guiding principles of limited shareholder liability and the fact that shareholders occasionally misuse the corporate form as a

shield from liability for their own misdeeds." *Id.* at ¶¶ 26-27, citing *Belvedere*, 67 Ohio St.3d at 287, 289. Therefore, in order to disregard the corporate form and hold an individual shareholder "liable for wrongs committed by the corporation," the plaintiff must demonstrate all three of the following:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) ["defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act"] against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at ¶¶ 18, 29, quoting and modifying *Belvedere,* 67 Ohio St.3d 274, at paragraph three of the syllabus. Clarifying the standard for piercing the corporate veil, the *Dombroski* court held that piercing cannot be applied to a mere "unjust or inequitable act," otherwise "virtually every close corporation could be pierced when sued, as nearly every lawsuit sets forth a form of unjust or inequitable action and close corporations are by definition controlled by an individual or small group of shareholders." *Id.* at ¶ 27. Instead, piercing is limited to extreme circumstances that amount to fraud, crime, "or a similarly unlawful act." *Id.* at ¶ 29.

{¶76} By following the Ohio Supreme Court's standard for piercing the corporate veil, we reject Appellants' contention that the trial court should have applied the abrogated standard of *North v. Higbee Co.*, 131 Ohio St. 507, 3 N.E.2d 391 (1936), which required that the corporation be "formed for the purpose of

perpetrating a fraud." *See LeRoux*, 77 Ohio App.3d at 421, 423 (quoting the *North v. Higbee* standard and refusing to follow it); *Belvedere*, 67 Ohio St.3d at 287-288 (abrogating the standard because "[t]he requirement that a corporation be *formed* in order to perpetrate a fraud is simply too strict.") (Emphasis sic.).

{¶77} In this case, the trial court followed the standard established by the Ohio Supreme Court in *Belvedere*, quoting it nearly directly on page 657 of the Trial Transcript. Contrary to Appellants' contention, the trial court did not find "that the corporation must simply be used in committing a fraud," but properly held that "control of the corporation by those to be held liable [must be] exercised in a manner to commit fraud or an illegal act against the person seeking to disregard corporate entity." (Tr. at 657.) Relying on the *Belvedere* case, the trial court rejected the standard offered by Appellants. We find no error in the standard applied by the trial court to the doctrine of piercing the corporate veil.

*b. Trial Court's Denial of the Motion for Directed Verdict*

{¶78} Appellants argue that the issue of piercing the corporate veil should not have gone to the jury because there were no facts in evidence to support the elements of the claim. Therefore, according to Appellants, the trial court should have granted their motion for directed verdict.

{¶79} A motion for directed verdict presents a question of law and therefore, it requires a de novo review. *White v. Leimbach*, 131 Ohio St.3d 21,

2011-Ohio-6238, 959 N.E.2d 1033, ¶ 22. Although a motion for directed verdict does not present a question of fact, in deciding such a motion, the trial court must review and consider the evidence and "determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25. Under this standard the court does not weigh the evidence or try "the credibility of witnesses," but instead, the court

> assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove.

*Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68-69, 430 N.E.2d 935 (1982).

> According to Civ.R. 50(A)(4), a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, "reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." The "reasonable minds" test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party.

*Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.,* 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 3, quoting Civ.R. 50(A)(4), and *Ruta*, 69 Ohio St. 2d at 69. Therefore, if evidence for each element of the claim exists, it is sufficient "to take the case to the jury" and the motion for directed verdict must be denied. *Ruta*, 69 Ohio St.2d at 68. We will thus review de novo whether Snapp presented

sufficient evidence for each element of the *Belvedere* standard for piercing the corporate veil in his case-in-chief.

**{¶80}** As to the first prong of the *Belvedere* test, the courts look at the following nonexclusive list of factors to determine whether an individual's complete control over the corporation warrants treating the corporation as the individual's alter ego: "(1) whether corporate formalities were observed, (2) whether corporate records were kept, (3) whether corporate funds were commingled with personal funds, and (4) whether corporate property was used for a personal purpose." *My Father's House No. 1 v. McCardle*, 2013-Ohio-420, 986 N.E.2d 1081, ¶ 28 (3d Dist.), quoting *Pottschmidt v. Thomas J. Klosterman, M.D., Inc.,* 169 Ohio App.3d 824, 2006-Ohio-6964, 865 N.E.2d 111, ¶ 37 (9th Dist.). Here, there was undisputed evidence that Kappeler failed to issue shares for the corporation and did not carefully evidence his yearly corporate meetings in the minutes. There was undisputed evidence that he co-mingled corporate funds with his personal finances and used the corporation's money to pay for his personal credit cards, personal medical treatment, his truck, and his daughter's apartment. Therefore, there was evidence "of substantive probative value" that Kappeler's control over Castlebrook was so complete that Castlebrook had "no separate mind, will, or existence of its own." *See Goodyear*, 2002-Ohio-2842, at ¶ 3; *Belvedere,* 67 Ohio St.3d 274 at paragraph three of the syllabus.

**{¶81}** As to the second part of the *Belvedere* standard, Snapp argued that Kappeler used his control over Castlebrook to commit fraud, which is one of the acts for which the corporate veil can be pierced. The elements of fraud in Ohio require

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 47, quoting *Gaines v. Preterm-Cleveland Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987). Snapp presented evidence that Kappeler made multiple statements regarding the estimated or promised costs of the transaction and the evidence that the actual costs were significantly higher than the estimates. There was evidence of billing statements that included charges not actually owed by Snapp. Snapp presented proof that these statements were material to him in that he based his decisions to hire and to make payments to Castlebrook in reliance upon them. Although Kappeler denied knowledge that the statements were false and denied any intent to mislead, Snapp argued that those elements could be inferred from his actions, such as the fact that although Kappeler normally handled his transactions through a contract, he intentionally did not provide a written agreement in this

-43-

case so that he could overcharge Snapp. Finally, the money damages were shown through the calculations provided by Snapp and by his expert witness. Considering the general elements for fraud, there was sufficient evidence to support the second prong of the *Belvedere* standard.

{¶82} The third prong of the *Belvedere* standard required proof that Snapp's damages resulted from Kappeler's complete control over Castlebrook. The testimony provided during Snapp's case-in-chief could show that Snapp sustained his economic damages due to Kappeler's actions, which included giving estimates, performing the work on the project, and submitting billing statements, over which Kappeler had such complete control.

{¶83} Assuming the truth of all the evidence presented by Snapp during his case in chief and giving it the most favorable interpretation, we conclude that there was sufficient evidence of substantive probative value to support each element of Snapp's claim for piercing the corporate veil. Accordingly, the trial court did not err in denying Appellants' motion for directed verdict.

*c. Manifest Weight of the Evidence*

{¶84} Appellants argue that, even if the evidence was sufficient to send the issue to the jury, the jury's verdict piercing the corporate veil and finding Kappeler personally liable was against the manifest weight of the evidence. Among other things, they argue that the jury pierced the veil relying on an improper standard

discussed by Snapp's counsel in his closing statement, requiring only "a finding that the corporation is an alter ego of the individual." (App't Br. at 17, quoting Tr. at 1175.) Nevertheless, the record discloses that the jury instructions read into the record by the trial judge, as well as the jury interrogatories, included the proper three-prong *Belvedere* standard.[4] (*See* Tr. at 1240; R. at 246.)

**{¶85}** The "'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion." *Eastley*, 2012-Ohio-2179, at ¶ 19. Under this standard, the reviewing court "does not reweigh the evidence" but it applies the presumption that the jury's findings of fact are correct. *Southeast Land Dev., Ltd. v. Primrose Mgt. L.L.C.*, 193 Ohio App.3d 465, 2011-Ohio-2341, 952 N.E.2d 563, ¶ 7 (3d Dist.); *Drummer v. Drummer*, 3d Dist. Putnam No. 12-11-10, 2012-Ohio-3064, ¶ 7. "Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment." *Drummer*, 2012-Ohio-3064, at ¶ 7; citing *State v. Wilson,* 113 Ohio St.3d 382, 865 N.E.2d 1264, 2007-Ohio-2202, ¶ 40. Because "piercing the corporate veil is primarily a matter for the trier of fact," the verdict will be upheld if competent, credible evidence supports the jury's decision. *State ex rel. DeWine v. S & R Recycling, Inc.*, 195 Ohio App.3d 744, 2011-Ohio-3371, 961 N.E.2d 1153, ¶ 29 (7th Dist.), quoting *Clinical Components, Inc. v. Leffler Industries, Inc.*, 9th Dist. No. 95CA0085, 1997 WL

---

[4] We note that while the jury interrogatory on this claim was entitled "Interrogatory for Plaintiff's Claim on Alter Ego Theory," it nevertheless included the proper three-prong *Belvedere* standard.

28246, *3 (Jan. 22, 1997); *see also C. E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), at syllabus ("Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.").

{¶86} As discussed in the previous section of this opinion, Snapp provided evidence in support of each of the elements of the *Belvedere* test. A lot of the evidence was undisputed: Kappeler admitted that there were no shares for the corporation, that he co-mingled funds, and that he did not follow many of the corporate formalities. Although there was evidence that Castlebrook was created many years prior to the Snapp project and had operated without any allegations of improprieties, this did not contradict the jury's finding that his control over the corporation was exercised to commit fraud. While Kappeler disputed his intent to defraud Snapp, he could not explain the double and triple charges appearing in his calculations related to the project and he was unable to provide a complete accounting for the project. Kappeler denied that Snapp suffered financial damages as a result of his actions, but he admitted being unable to prove whether the amount paid by Snapp was actually spent on the project.

{¶87} Accordingly, a review of the record indicates that all the essential elements of the *Belvedere* test are supported by some competent and credible

evidence. Given the fact that there was some contradicting testimony, the facts at trial presented an issue for the jury to resolve as to whether the corporate veil of Castlebrook should be pierced. Following the legal standards, we presume that the jury's assessment of credibility and findings of fact are correct and hold that its verdict is not against the manifest weight of the evidence. *See Southeast Land Dev., Ltd.*, 2011-Ohio-2341, at ¶ 7; *Drummer*, 2012-Ohio-3064, at ¶ 7.

**{¶88}** Because the trial court applied the correct standard for piercing the corporate veil and properly sent the case to the jury, and because the jury's finding piercing the corporate veil was not against the manifest weight of the evidence, we overrule Appellants' first assignment of error.[5]

---

[5] We further note that in this matter, Kappeler was sued personally for his own actions in addition to being sued as an alter ego of his corporation Castlebrook for the corporation's actions. Snapp's Complaint alleged that both Defendants, Kappeler and Castlebrook, committed unfair deceptive or unconscionable acts and practices in violation of the Ohio Consumer Sales Practices Act; both Defendants committed fraud upon him; and both Defendants were unjustly enriched. (R. at 81, Am. Compl.) The Complaint demanded damages from both Defendants, jointly and severally. (*Id.*) Throughout the trial, the parties referred to Kappeler and Castlebrook interchangeably and Snapp consistently argued that the actions of Kappeler caused the alleged damages. In his closing remarks, Plaintiff's counsel argued that Kappeler defrauded and scammed Snapp and asked the jury to find both Kappeler and Castlebrook liable on each of the claims. (Tr. at 1173, 1178, 1184, 1186.) The proposed jury instructions contemplated findings of liability by both Defendants on each of the claims. (R. at 229-232, Pl.'s Proposed Jury Instructions on Fraud, Unjust Enrichment, Breach of Contract, and Violations of Ohio CSPA, June 22, 2012.) The actual jury instructions, read by the judge to the jury during trial, again referred to "Defendants" for the claims of CSPA violation, fraud, and unjust enrichment. (Tr. at 1231-1238.)

Pursuant to the specific interrogatories, the jury found that Castlebrook violated CSPA, committed fraud, and was unjustly enriched. (Tr. at 1249-1259.) It did not make any express finding of whether Kappeler personally violated CSPA, committed fraud, or was unjustly enriched, but it did find that Castlebrook had no separate mind or existence on its own and all its actions were the actions of Kappeler. Accordingly, this finding implies a conclusion that the jury found Kappeler liable for the above acts. Further, the general verdict is consistent with the specific interrogatories in its finding "for Plaintiff, Scott A. Snapp, and against Castlebrook Builders, Inc. and Steve Kappeler." (Tr. at 1268; R. at 253, General Verdict, July 12, 2012.)

Therefore, we note that Kappeler's personal liability was not based solely on the theory of piercing the corporate veil. Rather, he was liable for his own actions of violating the CSPA, committing fraud, and being unjustly enriched, and he was additionally found liable for the actions of his corporation,

### 2. *Award of Treble Damages and Attorney Fees*

**{¶89}** In their second assignment of error, Appellants argue that the trial court improperly awarded Snapp treble damages for Appellants' violation of CSPA. They also claim that the award of full amount of attorney fees to Snapp was unjustified under the Act.

### *a. Treble Damages*

**{¶90}** The jury found that Appellants violated CSPA and, based upon that finding, the jury awarded Snapp $10,000 in damages. The trial court trebled damages pursuant to CSPA, which "allows consumers to recover treble damages and attorney fees from sellers for deceptive or unconscionable acts." *Reagans v. MountainHigh Coachworks, Inc.*, 117 Ohio St.3d 22, 2008-Ohio-271, 881 N.E.2d 245, ¶ 34, citing R.C. 1345.09(B). Appellants claim that the trial court erred in awarding treble damages without making a separate finding that their actions were deceptive or unconscionable. (App't Br. at 18-19.)

**{¶91}** In order to treble the damages, the R.C. 1345.09(B) provides:

---

Castlebrook, on the alter ego—piercing the corporate veil theory. It follows that even if Kappeler were successful on his first assignment of error, he would not avoid being held personally liable in this action. *See Stewart v. R.A. Eberts Co., Inc.*, 4th Dist. No. 08CA10, 2009-Ohio-4418, ¶ 30 ("Each of the individual defendants is also subject to potential liability for any of his individual wrongful conduct against Stewart because neither the corporate shield nor a shield of limited liability insulates a wrongdoer from liability for his or her own tortious acts."); *Gator Dev. Corp. v. VHH, Ltd.,* 1st Dist. No. C-080193, 2009-Ohio-1802, ¶ 38; *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 2002-Ohio-5194, 778 N.E.2d 80, ¶ 47, 49 (7th Dist.) ("'Directors and corporate officers generally may be personally liable for fraud even though the corporation may be liable also.' * * * plaintiffs need not pierce the corporate veil to hold individuals liable who allegedly personally committed fraud."), quoting *Centennial Ins. Co. of N.Y. v. Vic Tanny Internatl. of Toledo, Inc.*, 46 Ohio App.2d 137, 141, 346 N.E.2d 330 (6th Dist.1975).

(B) Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05[6] of the Revised Code before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02,[7] 1345.03,[8] or 1345.031[9] of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code, the consumer may rescind the transaction or recover, but not in a class action, three times the amount of the consumer's actual economic damages or two hundred dollars, whichever is greater, plus an amount not exceeding five thousand dollars in noneconomic damages or recover damages or other appropriate relief in a class action under Civil Rule 23, as amended.

R.C. 1345.09.

**{¶92}** Thus, in order for treble damages to be awarded, R.C. 1345.09(B) requires one of the following: (1) the Attorney General has promulgated and made available for public inspection a rule that declares the specific act or practice committed by the defendant to be unfair, deceptive, or unconscionable such as violating sections 1345.02, 1345.03, or 1345.031 of the Revised Code, and the rule was adopted "before the consumer transaction on which the action is based"; or (2) an Ohio court has issued a decision, made available for public inspection, that determines that the specific act or practice committed by the defendant was unfair, deceptive, or unconscionable, such as violating sections 1345.02, 1345.03, or

---

[6] R.C. 1345.05(B)(2) grants the Attorney General the power to "[a]dopt, amend, and repeal substantive rules defining with reasonable specificity acts or practices that violate sections 1345.02, 1345.03, and 1345.031 of the Revised Code"

[7] R.C. 1345.02 defines unfair or deceptive acts or practices in connection with consumer transactions.

[8] R.C. 1345.03 defines unconscionable acts or practices in connection with consumer transactions.

[9] R.C. 1345.031 defines unconscionable act or practice "concerning a consumer transaction in connection with a residential mortgage."

-49-

1345.031 of the Revised Code, and the decision "has been made available for public inspection under R.C. 1345.05(A)(3)" before the allegedly unfair, deceptive, or unconscionable act or practice was committed. R.C. 1345.09(B); 1345.05; 1345.02-1345.031; *Fleischer v. George*, 9th Dist. Medina No. 09CA0057-M, 2010-Ohio-3941, ¶ 17; *Warren v. Denes Concrete, Inc.*, 9th Dist. Lorain No. 08CA009414, 2009-Ohio-2784, ¶ 23.

{¶93} Contrary to Appellants' assertion, the statutory language does not require a factual finding by the jury or the trial court that the specific acts of the defendant in each case were committed in a manner that was unfair, deceptive, or unconscionable. *See Snider v. Conley's Serv.*, 5th Dist. Stark No. 1999CA00153, 2000 WL 873780, *2-3 (June 12, 2000) (holding that the trial court erred in requiring the jury to be instructed on the treble damages statute in order to make a determination that the plaintiff is entitled to treble damages). Rather, the decision of whether treble damages should be awarded is a legal issue for the trial court. *Fleischer*, 2010-Ohio-3941, at ¶ 18; *Snider*, 2000 WL 873780, at *2. If the plaintiff makes a showing that a decision of the Attorney General or a trial court has previously determined the actions of which the defendant has been found liable to be unfair, deceptive, or unconscionable, the court is required to treble the damages. *Warren*, 2009-Ohio-2784, at ¶ 23, *Snider*, 2000 WL 873780, at *3.

**{¶94}** "Questions of law are reviewed de novo, with no deference to the trial court's determination." *Fleischer*, 2010-Ohio-3941, at ¶ 18; *State v. Brown*, 3d Dist. Marion No. 9-10-12, 2010-Ohio-4546, ¶ 8. We will thus review de novo whether there was sufficient basis for trebling the damages in the instant case.

**{¶95}** In his "Memorandum in Support of Plaintiff's Request for Attorney Fees, Costs, and Treble Damages," Snapp cited the Ohio Administrative Code Section that defines acts and practices determined by the Attorney General to be deceptive in violation of R.C. 1345.02. (*See* R. at 274, citing Ohio Adm.Code 109:4-3-05 (defining "deceptive act or practice in connection with a consumer transaction involving the performance of either repairs or any service where the anticipated cost exceeds twenty-five dollars"); Ohio Adm.Code 109:4-3-01 (stating that the purpose of the rules is to "[d]efine with reasonable specificity acts and practices which violate section 1345.02 or 1345.03, or 1345.031 of the Revised Code")).

**{¶96}** Based on the instructions that used the same language of the Ohio Administrative Code, the jury found Appellants guilty of CSPA violations. (Tr. at 1231-1233, 1266; R. at 247.) There were no specific interrogatories asking the jury to explain which particular acts by Appellants violated CSPA. But because the instructions followed the language of the Ohio Administrative Code defining deceptive acts and practices, it implies that the acts of which the jury found

-51-

Appellants liable have previously been determined to be deceptive by the Attorney General. (*See* Tr. at 1231-1233, 1266; R. at 247.) Further, the cited Ohio Administrative Code Section was effective as of March 14, 2005. Ohio Adm.Code 109:4-3-05. Therefore it was before the consumer transaction between Snapp and Appellants. Accordingly, we hold that Snapp has made the necessary showing to satisfy R.C. 1345.09(B) and therefore, the trial court was required to treble the damages.

### b. Attorney's Fees

{¶97} The second contention under this assignment of error is that the trial court improperly awarded attorney's fees for all claims, even those unrelated to the violation of the CSPA. R.C. 1345.09(F)(2) permits a trial court, in its discretion, to award reasonable attorney's fees against suppliers who intentionally commit unfair or deceptive sales practices. *Reagans*, 2008-Ohio-271, at ¶ 34. Appellants do not dispute the trial court's finding that Snapp should have been awarded attorney's fees, but they argue that the award was excessive and that it was an abuse of discretion, because it amounted to "nearly seven times the amount of the CSPA violation." (App't Br. at 19-21.) Appellants contend that the trial court "failed to provide a proper basis for its award of attorney fees" and failed to find that the total fees were reasonable. (*Id.*) They demand a reduction in the

judgment, which would reflect an award of attorney's fees for the CSPA claims only.

**{¶98}** The Ohio Supreme Court held that "the amount of attorney fees awarded pursuant to R.C. 1345.09(F) [does not have to] bear a direct relationship to the dollar amount of the settlement, between the consumer and the supplier." *Bittner v. Tri-Cty. Toyota, Inc.*, 58 Ohio St.3d 143, 144, 569 N.E.2d 464 (1991). Therefore, the fact that the award exceeded the amount calculated by the jury to compensate for the CSPA violation does not make the attorney's fees unreasonable. *See id.*, quoting *Riverside v. Rivera*, 477 U.S. 561, 578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) ("A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious * * * claims but relatively small potential damages to obtain redress from the courts.").

**{¶99}** The statute does limit the damages "to the work reasonably performed." R.C. 1345.09(F). Thus, the amount of reasonable attorney's fees is calculated by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate, but the court may "adjust the fee upward or downward" based on the factors permitted by the Rules of Professional Conduct. *Bittner* at 145, citing DR 2-106(B), *superseded by* Prof.Cond.R. 1.5. Furthermore, under the statute, a defendant is only entitled to recover fees "associated with" the

claim for a CSPA violation.  *Fleischer*, 2010-Ohio-3941, at ¶ 32, citing *Bittner*, 58 Ohio St.3d at 145.

**{¶100}** Nevertheless, in certain situations, the claims are not separable because they stem from "a common core of facts and related legal theories."  *Id.* quoting *Parker v. I & F Insulation Co., Inc.*, 1st Dist. Hamilton No. C-960602, 1998 WL 144510, *6 (Mar. 27, 1998), and citing *Moore v. Vandemark Co., Inc.,* 12th Dist. Clermont No. CA2003-07-063, 2004-Ohio-4313, ¶ 30; *Luft v. Perry Cty. Lumber & Supply Co.,* 10th Dist. Franklin No. 02AP-559, 2003-Ohio-2305, ¶ 34; *Budner v. Lake Erie Homes*, 11th Dist. Portage No.2000-P-0108, 2001 WL 1149547, *2 (Sept. 28, 2001).  Therefore, "[t]he trial court is only required to separate the fees if the claims for which fees are allowable are distinct from claims for which fees are not awarded." *Id.*

**{¶101}** Appellants argue that the trial court erred when it failed to calculate the amount of fees by multiplying the number of hours reasonably expended by a reasonable hourly rate.  We note that a calculation of the number of hours spent on litigating this case multiplied by the hourly rate was provided in exhibits to the hearing that took place on August 29, 2012, and the accuracy of the calculations was not disputed.  (*See* Hearing Tr. at 30-31, Ex. 1-1P, Aug. 29, 2012.)  Based upon the testimony, which, among others, indicated that the fees were discounted prior to being submitted to the client, the trial court determined that the fees and

the hours expended were reasonable. (*See* Hearing Tr. at 10-11, 27.) We do not believe that the trial court's failure to single-handedly add up and multiply the numbers amounts to a reversible error. Likewise, the fact that the trial court did not consider additional factors to adjust the fee is not an error, as the trial court is not required but rather, is given discretion to adjust the fees "upward or downward." *Bittner*, 58 Ohio St.3d at 145; *accord Demming v. Smith*, 8th Dist. Cuyahoga No. 94106, 2010-Ohio-4134, ¶ 51, quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 435-436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Turner v. Progessive Cas. Ins. Co.*, 8th Dist. Cuyahoga No. 78862, 2001 WL 406232, *1 (Apr. 19, 2001).

{¶102} Appellants assert that, in the instant case, the CSPA claim was distinct from the claims of fraud, breach of contract, unjust enrichment, and piercing the corporate veil. Nonetheless, the trial court found that "the facts of all of the claims for relief were so intertwined that all of the evidence during the trial was related to the Consumer Sales Practices Act violation" and that it was reasonable to award the entirety of the attorney's fees based upon the evidence properly documenting the work performed and expert testimony that the fees were reasonable. (R. at 279, at 3.)

{¶103} The trial court's determination in this respect should not be reversed absent an abuse of discretion. *Shellhorn v. Kohler Chrysler-Plymouth*, 3d Dist. Wyandot No. 16-92-29, 1993 WL 264613, *2 (July 15, 1993).

> Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere. The trial judge [who] participated not only in the trial but also in many of the preliminary proceedings leading up to the trial has an infinitely better opportunity to determine the value of services rendered by lawyers who have tried a case before him than does an appellate court.

*Bittner*, 58 Ohio St.3d at 146, quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91, 491 N.E.2d 345 (12th Dist.1985). Accordingly, we will not substitute our judgment for that of the trial court unless the trial court's attitude was "unreasonable, arbitrary, or unconscionable." *Fleischer*, 2010-Ohio-3941, at ¶ 30.

{¶104} As the trial court noted, this case is factually similar to *Fleischer*, where the plaintiff asserted claims for fraud, breach of contract, and CSPA violations arising out of the defendant's undertaking to complete construction and renovations at the plaintiff's residence. *Fleischer*, 2010-Ohio-3941, ¶ 33. In that case, the court noted that all of the claims stemmed from the same set of facts: misrepresentations by the defendant regarding the progress of the construction and improper billing practices. *Id.* The Court of Appeals upheld the trial court's award of the entirety of the attorney's fees under the "common core of facts"

theory. *Id.* Similarly, here, there were no separate facts at issue that gave rise to the CSPA violation. The same actions by Appellants that were alleged to be fraudulent and to result in breach of contract and unjust enrichment were also actions that purportedly violated CSPA: representations as to price and billing, lack of estimate, failure to provide accounting for services rendered, and excessive billing that included double and triple charges. Appellants admit that some claims "yielded overlapping testimony." (App't Br. at 21.) Furthermore, the claim for piercing the corporate veil was not at any point separately litigated. Even though Appellants allege that "a large part of the discovery process and trial was devoted to the alter ego theory" (*id.*), we note that the majority of the exhibits submitted for our review related to the charges and billing disputes.

{¶105} Having reviewed the record in the case, we hold that the trial court's attitude in awarding attorney's fees for all of the claims together at the rate established by the evidence was not unreasonable, arbitrary, or unconscionable. Therefore, we cannot substitute our judgment for that of the trial court and reduce the trial court's award of attorney's fees.

{¶106} For the above reasons, Appellants' second assignment of error is overruled.

### 3. Consistency of the Verdicts and Damages Awards

{¶107} In their final assignment of error, Appellants claim that the jury verdicts as to the breach of contract and unjust enrichment were inconsistent and the amounts awarded in damages were against the manifest weight of the evidence. This, according to Appellants, illustrates that the jury "lost its way" and therefore, the verdicts should be set aside. (App't Br. at 22-23.)

### a. Verdict Form Consistency

{¶108} The trial court educated the jury through its instructions that they could not find Castlebrook liable for both breach of contract and unjust enrichment. (Tr. at 1243-1244.) Appellants point out that the jury interrogatory form on Snapp's claim for breach of contract included signatures of seven jurors who found Castlebrook not liable, while the interrogatory form on Snapp's claim for unjust enrichment included signatures of eight jurors who found Castlebrook liable. (R. at 250-251.) Hence, Appellants assert that one juror created inconsistency by finding Castlebrook liable on both claims in spite of the instructions expressly prohibiting such finding.

{¶109} In our review of the interrogatory forms submitted with the record, we are unable to specify whether the eighth juror found against Castlebrook on this claim or whether the lack of signature is a result of an oversight, confusion, or an error. Unlike Appellants, we will not speculate about the facts behind the

missing signature because they have no bearing on our resolution of this issue. As Snapp properly points out in his Brief, this "inconsistency" by one juror is harmless because under Civ.R. 48, only six out of eight jurors were needed for the verdict to stand. "In all civil actions, a jury shall render a verdict upon the concurrence of three-fourths or more of their number. * * * For juries with less than four members, the verdict must be unanimous." Civ.R. 48. Here, the jury consisted of eight members and, as such, the minimum required for a valid verdict was six jurors. Even were we to disqualify one juror who created the alleged inconsistency, there still remain seven valid signatures under the jury's findings as to both, the breach of contract and the unjust enrichment claims.

{¶110} Furthermore, Appellants failed to show how the specific findings in the jury interrogatories are inconsistent and irreconcilable with the general verdict so as to become successful in challenging the verdict. *See Becker v. BancOhio Nat. Bank*, 17 Ohio St.3d 158, 162-63, 478 N.E.2d 776 (1985), quoting *Prendergast v. Ginsburg*, 7 Ohio Law Abs. 12, 119 Ohio St. 360, 164 N.E. 345 (1928) ("the law makes it incumbent upon a party challenging a general verdict to show that the 'special findings, when considered together, are inconsistent and irreconcilable with the general verdict.'").

{¶111} Accordingly, we reject Appellants' contention that the jury verdicts were inconsistent.

*b. Jury's Calculations of Damages*

**{¶112}** Appellants challenge the jury's damages awards as against the manifest weight of evidence. They aver that the amount of $10,000 to "reasonably compensate [Snapp] for the actual loss that he sustained as the natural and probable consequence" of Castlebrook's violations of the CSPA was "inconsistent with all testimony presented and cannot be calculated under any reasonable configuration based upon the testimony." (App't Br. at 22-23, quoting R. 247, Interrogatory for Pl's Claim on CSPA.) In a similar manner, Appellants dispute an award of $332,000 in damages for the remaining claims, stating that "[n]o calculation of costs creates an overpayment of $332,000." (*Id.* at 23.)

**{¶113}** The standard for the manifest weight of the evidence, as delineated in part 1.c. of this opinion, refers to persuasion and requires the reviewing court to presume that the jury's findings of fact are correct. *Eastley*, 2012-Ohio-2179, at ¶ 19; *Southeast Land Dev., Ltd.*, 2011-Ohio-2341, at ¶ 7; *Drummer*, 2012-Ohio-3064, at ¶ 7.

> In order to set aside a damage award as inadequate and against the manifest weight of the evidence, a reviewing court must determine that the verdict is so gross as to shock the sense of justice and fairness, cannot be reconciled with the undisputed evidence in the case, or is the result of an apparent failure by the jury to include all the items of damage making up the plaintiff's claim.

*Elwer v. Carrol's Corp.*, 3d Dist. Allen No. 1-06-33, 2006-Ohio-6085, ¶ 18, citing *Iames v. Murphy*, 106 Ohio App.3d 627, 631, 666 N.E.2d 1147 (1st Dist.1995).

Therefore, unless the jury's award of damages is "so contrary to the evidence that it results in a complete violation of substantial justice," we will not reverse its determination. *Iames*, 106 Ohio App.3d at 635.

{¶114} In the present case, the record indicates that a lot of testimony and evidence was presented at the trial regarding costs involved in Snapp's project. It included estimated and actual costs of the construction, as well as fees charged and paid by Snapp. Kappeler testified about several different numbers as to the amount of money he expended in working on the project, the amount that he billed for his own services, and the amounts billed by other subcontractors. His total calculations of the project's cost ranged from around $1,000,602 to $1,557,000. He was unable, however, to provide evidence to support all of his expenses. In addition, Kappeler admitted to multiple instances of double and triple billing evidenced in his calculations of charges submitted to the Snapp account.

{¶115} Snapp testified about an amount of over $1.3 million and provided evidence of over $1 million in payments submitted to Castlebrook. He provided testimony of an expert who calculated that the value of the project was between $540,000 and $580,000. He further provided expert testimony about expenses that were required to complete the project or fix the alleged deficiencies, which exceeded $10,000.

**{¶116}** In face of the multitude of disputed calculations, lack of evidence supporting some of the testimony, as well as contradicting evidence and testimony, the jury was charged with sorting the facts. Many factors could have contributed to the jury's decision, including their determination of credibility of witnesses and the evidence. Since neither party submitted an interrogatory requesting the jury to itemize the damages, we cannot speculate how each number was calculated. We cannot conclude, however, that the number of $10,000 for the CSPA violation and the number of $332,000 for fraud and unjust enrichment were so contrary to the evidence that they result in a "complete violation of substantial justice." *Iames*, 106 Ohio App.3d at 631. The jury was presented with enough competent, credible evidence to support each of the above numbers. Therefore, after carefully considering the record, we hold that the jury verdicts with respect to damages are not against the manifest weight of the evidence.

**{¶117}** Because the jury's verdicts were not inconsistent and against the manifest weight of the evidence, we overrule Appellants' third assignment of error.

## CONCLUSION

**{¶118}** Having reviewed the arguments, the briefs, and the record in this case, we find no error prejudicial to Appellants, in the particulars assigned and

argued.  The judgment of the Court of Common Pleas of Shelby County, Ohio is thereby affirmed.

**Judgment Affirmed**

**PRESTON and SHAW, J.J., concur.**

**/jlr**